IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GUARDIAN PIPELINE, L.L.C., a Delaware Limited Liability Company, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | No. 01 C 4696 |
| 950.80 ACRES OF LAND, more or less, in Kendall and McHenry Counties, Illinois; RANDOLPH J. REIGH, et al., and UNKNOWN OTHERS, and WILL COUNTY ILLINOIS, a Body Politic and Corporate, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Guardian Pipeline sought condemnation of numerous parcels of land for permanent and temporary easements for the construction of a pipeline in northeastern Illinois. An injunction was granted allowing Guardian to take immediate possession of the land, subject to Guardian posting a bond for payment of just compensation to the various property owners. The court appointed a commission for the purpose of holding the necessary hearings, which spanned a period of over two years. On July 6, 2006, the commission filed its report. Guardian and several sets of defendants have filed objections to the report. For the following reasons, we overrule those objections and adopt the report in its entirety.

## BACKGROUND

On June 21, 2001, plaintiff Guardian Pipeline, Inc. ("Guardian") filed a complaint for condemnation of easements against the owners of numerous properties in northeastern Illinois for the imposition of a natural gas pipeline pursuant to a certificate from the Federal Energy

Regulatory Commission. Guardian amended its complaint six times, filing the Sixth Amended Complaint on February 5, 2003. This filing occurred after Guardian had been granted condemnation on January 3, 2002, and immediate possession of the land through an injunction of this court on April 4, 2002.

On April 24, 2002, this court proposed the appointment of a commission to determine just compensation awards for defendant property owners, pending objection of the proposed commissioners from the parties. The appointment was confirmed in the court's order of May 23, 2002, and instructions were issued to the commission. Hearings commenced on July 14, 2003, and concluded on August 30, 2005. There were thirteen attorney teams representing properties,[1] with one defendant representing himself. The owners of six properties did not appear and thus were defaulted.

On July 6, 2006, the Commission issued a 277-page report detailing its findings of just compensation on defendants' land. Plaintiff Guardian, and the Cinquino, Porter, Figliulo, Ryan, Wormley, Morrissey and McHenry County Conservation District defendants filed objections to the report. Since the dates of those filings, the McHenry County Conservation District and the Ryan defendants have settled with Guardian, and so we do not consider their objections.[2]

## ANALYSIS

As five sets of defendants and Guardian have made objections, we attempt to consolidate similar objections, where possible, and deal with those general objections first. We

---

[1]We refer in this opinion to each group of defendants generally by the last name of their respective counsel. For example, all defendants who were represented by Leo and Celeste Cinquino are the "Cinquino defendants."

[2]We also do not consider Guardian's objections to the commission's determination regarding the Vidican, McShane, Moran, Hamman or Ellis tracts, as those defendants have since settled with Guardian.

then move on to objections relating to individual parcels of land.[3] For the sake of brevity, we note that we have omitted much of the factual background relating to each individual tract and only discuss those facts relevant to the specific objections.[4]

<u>Standard of Review</u>

The parties do not agree on the standard of review. Some of the defendants claim that the standard of review is "clearly erroneous." This was the correct standard until 2003, when the Federal Rule of Civil Procedure 53 was significantly amended. Currently, Rule 53(g)(2) states that "this court must decide *de novo* all objections to findings of fact made or recommended by a master unless the parties stipulate" otherwise. Rule 71A(h) adopts this standard of review for condemnation proceedings. The order of March 27, 2003, accompanying the amendments to the federal rules states that those amendments "take effect on December 1, 2003, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." This proceeding was pending at the time these amendments took effect, but we find it both just and practicable to apply the *de novo* standard of review here.[5] Thus, we review *de novo* the findings of fact and conclusions of law objected to by the parties, and all other findings of fact and conclusions of law may, but need not be, reviewed *de novo*. <u>Luma Corp. v. Stryker Corp.</u>, 2006 U.S. Dist.

---

[3]Several defendants have objected to rulings made by this court in addition to aspects of the Commission's report. We do not review our own rulings on this motion. Furthermore, we will not deal with the dispute over crop damage payments on this motion.

[4]A full discussion of the tracts and the commission's analysis can be found in the commission's report (dkt. 487, filed July 6, 2006).

[5]The Krentz and Barhnardt defendants stated that they do not object to the commission's report because – they erroneously believed – the standard of review was clearly erroneous. However, since we uphold the findings of the commission in its entirety under the *de novo* standard, objections made by these defendants would likely not have been successful.

LEXIS 7905, *12 (D. W. Va. Feb. 3, 2006)(citing Advisory Committee's Notes on 2003 Amendments to Rule 53(g)).

Rule 53(g)'s – and thus Rule 71A's – requirements for *de novo* review is consistent with the *de novo* standard of review for a magistrate judge's report under Rule 72(b). United States v. Fairway Capital Corp., 433 F. Supp. 2d 226, 232 (D. R. I. 2006). Such review does not require the court to have a separate hearing to redetermine the credibility of parties, nor does it require that we accept additional evidence. *De novo* review requires more than a determination that the commission's decisions were not clearly erroneous; it requires the court to find the commission's decisions to be correct. However, "if following a review of the record the district court is satisfied with the [commission's] findings . . . it may in its discretion treat those findings and recommendations as its own." Goffman v. Gross, 59 F.3d 668, 671 (7th Cir. 1995)(citing United States v. Raddatz, 447 U.S. 667, 675 (1980)).

Denial of Due Process

Several defendants object to the commission's hearings and subsequent report as a denial of their right to due process of law. They argue that they were denied an impartial tribunal by the appointment of this commission. First, defendants claim that the head of the commission, Thomas Ewert, should have been removed for a conflict of interest because, according to Martindale-Hubbell, his firm has represented numerous pipeline companies throughout the years, including Guardian. We note that Ewert's firm has not, in fact, represented Guardian. Upon receiving word of this allegation, Ewert researched the Martindale reference and spoke to the other lawyers at his firm. Ewert sent this court a letter stating that neither he nor anyone at his firm had ever represented Guardian, and that he believed the reason why Guardian was listed as a client was because he had been appointed

to this commission and Guardian had been the party paying the commissioners' fees. Thus, he concluded, the person in his office who compiled the list of clients for the website must have mistakenly listed Guardian among them because of Ewert's role in the commission. We have no reason to doubt Ewert on this point and find no reason to disqualify him as commissioner.

Defendants argue that Ewert's firm's representation of various pipeline companies was not disclosed at the time of appointment, and thus he should be disqualified. We do not agree. At the time of appointment defendants had in their possession all of Ewert's qualifications, including the name of his firm. They were given ample time to raise objections to the proposed commissioners' qualifications and backgrounds, and could easily have checked Ewert's background and objected to his appointment.[6] Defendants failed to do so and thus cannot now argue for Ewert's disqualification based on such information.

The Figliulo defendants argue that the proceedings favored Guardian because Guardian paid the fees of the commissioners and its trial team was present during the commission's visits to the tracts of land. With regard to the first allegation, Guardian paid the fees of the commission per the instruction of this court. Contrary to defendants' claim that Guardian approved the commissioners' fees and therefore had better access to the commissioners, the commissioners' fee statements were approved by this court alone. Guardian had no more access to or influence on the commissioners than did defendants.

With regard to the second allegation, while it is true that Guardian's attorneys were present at the viewing of each tract, so too is it true that all defendants, or at least their

---

[6] In fact, this court did remove a proposed alternate commissioner based on a possible conflict of interest raised by the Vidican defendants (Dkt. 278, May 23, 2002).

counsel, save two, were present for the visitation at their individual tracts.[7]  The Figliulo

defendants have not alleged that they were not permitted to be present at the visitation of their

tracts.  As the viewing occurred over the course of only several days, we believe that, had they

wanted to, defendants could have been present for all the visitations, but we can think of no

reason why they needed to be present for the viewing of tracts other than their own. Thus, this

objection is overruled.

The Figliulo defendants further argue that the disconnected nature of the commission's

hearings permitted Guardian to adjust its arguments based on the previous defendants'

evidence. Accepting, *arguendo*, defendants' claim, we do not see how a multitude of jury trials,

or even one large jury trial, would have cured this.[8]  Guardian would have had ample time

between jury trials to "adjust" its arguments based on the previous defendants' evidence and

the outcomes of those earlier trials.  Furthermore, in a single jury trial defendants' witnesses

would have likely testified first, as defendants bear the burden of proof in a just compensation

proceeding.  Thus it would have been days, perhaps weeks before Guardian's witnesses

testified, and they could surely have adjusted their arguments based on the testimony of

defendants' witnesses.

The Figliulo and Porter defendants argue that the hearings favored Guardian because

Guardian was present for the entire hearings and defendants were only present for their

individual tracts.  Thus, they argue, numerous pieces of evidence admitted in earlier stages of

---

[7]According to Guardian, the only two defendants who were not present at their viewing was Mr. Fritsch (the Mielke defendant) and Mr. Wormley. Fritsch was not present, according to Guardian, at the behest of his counsel, who declined to participate. Fritsch made no objection to the commission's report. Wormley's tract was also not viewed by the commission, and we address defendant Wormley's objection regarding this issue below.

[8]Defendants base this argument on their argument that this court erred in denying their request for a jury trial, which, as we stated above, we do not address on this motion.

the proceeding (against other defendants) were later adopted by the commission against the Figliulo and Porter defendants, without them having the opportunity to object to admission of the evidence or to cross-examine its contents. We note that defendants raised this objection during the hearings. In the case of the Porter defendants, it was regarding plaintiff's appraiser Batis' ability to be present at counsel table during the hearing, even though he was a rebuttal witness. (Tr. 3995-96). The commission acknowledged that it had already decided this issue on an earlier defendant's motion, but when the Porter defendants objected to not being privy to that argument the commission required Guardian to restate its argument so that the Porter defendants could respond. (Tr. 3996-4002).

With regards to the Figliulo defendants' objection, the commission acknowledged that certain pieces of evidence, and certain general testimony, would not be rehashed, such as the qualifications of both plaintiff's and defendants' appraisers, and that the general testimony of Batis had been made available for cross-examination by all defendants at an earlier date. (Tr. 8502-03). The Figliulo defendants argued to the commission that they did not take advantage of this opportunity because Batis was not listed as the appraisal witness against them, but, as Guardian pointed out, he was listed as a rebuttal witness long before the date he was made available for examination. (Tr. 8504-8506).

Furthermore, the commission gave both the Figliulo and Porter defendants the opportunity to object to any piece of evidence that had been earlier admitted, and gave them the opportunity to cross-examine any of that evidence as it related to their individual tracts. (Tr. 5436, 5602-5706, 8502, 8507). Thus, we find that any concern raised by the adoption of

earlier-admitted evidence was cured by the commission.[9]

The Porter defendants also argue that they were denied due process because (1) they were not kept informed of all of the dates of the hearings regarding other defendants, nor did they receive a list of exhibits from those dates, (2) it would have been cost-prohibitive for them to be present on those other dates, and (3) it was cost-prohibitive to order all of the transcripts of those dates. Thus, they were not present to object or cross-examine other testimony that may have had an impact on their case. We first note that all defendants were apprised of all of the hearing dates through the eleven status reports drawn up by Guardian and provided to this court and all individual defendants.[10] That defendants felt it cost-prohibitive to be present at all of those dates weighs no more in favor of a jury trial than of a commission. It would have been just as cost-prohibitive for defendants to have to be present in Chicago for several weeks during a long jury trial. Moreover, had this court held multiple smaller jury trials, it would seem defendants would want to be present at all the earlier trials for the same reason they now argue for being present at the earlier portions of the hearing. We further note that the Porter defendants were given a comprehensive exhibit list by Guardian, which is reflected in the record. (Tr. 5437). And, as we stated in our recent opinion regarding the Morrissey defendant's motion for costs, Guardian made available all of the transcripts for review by any party. Thus defendants' counsel had access to those transcripts, albeit not their

---

[9]The Porter defendants argue that there should have been separate hearings with separate determinations. However, they also argue that the lapse of time between the start of the hearings and the submission of the commission's report was unconscionable. We do not understand how these two objections square with one another. Requiring all of the submitted evidence to be reauthenticated at every hearing, in addition to requiring all of the experts to be requalified would have extended the hearings longer than they already were. Thus, unless the Porter defendants had been one of the first to have a hearing, it would likely have had its judgment pushed further back.

[10]See dkt. 372, 386, 392, 406, 419, 424, 429, 436, 444, 449, and 456.

own personal copies.

Finally, several defendants argue that the commission erred in considering testimony and evidence that had been barred. We find defendants' argument without merit. As the commission noted in its report, certain pieces of evidence and certain testimony that had been admitted in portions of the hearings were barred in other portions based on the motions of the parties. For example, the Porter defendants successfully barred the rebuttal testimony of Batis based on this court's order regarding the testimony of Patricia McGarr that only one appraiser may testify as to valuation on any given parcel of land, and successfully barred the testimony of Tonelli, Ball, Walsh and Goldstein because of Guardian's late disclosure of these witnesses. (Tr. 5729-5730). The commission was made up of three lawyers, all schooled in the law of evidence. It is clear from the record that the commission understood the possible conflicts in hearing testimony in one portion that it would need to disregard in another. The commission assuaged the Porter defendants' concerns during the hearing when the defendants spoke of "unringing the bell." (Tr. 5742-5744). We find no reason to believe that the commission considered any barred testimony or evidence in its decisionmaking process.

<u>Objection to Commission's Decision to Admit Certain Testimony</u>

This court's instructions gave the commission the authority to rule on the admissibility of evidence pursuant to the federal rules of evidence. <u>Guardian Pipeline, L.L.C. v. 950.80 Acres of Land</u>, 2002 U.S. Dist. LEXIS 9260, *8 (N.D. Ill. 2002). Several defendants object to the admission of testimony by Guardian's appraisers, Batis and Magdziarz. Guardian objects to the testimony of several of the defendants' appraisers, namely Southcomb, Sheridan, Harrison and MaRous. Additionally, the Figliulo defendants renew their motion to strike the testimony, with regards to their parcel of land, of Tonelli, a land planner and expert for

Guardian.

It appears that some of these objections were the subject of <u>Daubert</u> motions to exclude, while others dealt more with the failure to disclose the expert's opinion. We address the objections to each witness separately.

<u>Joseph Batis</u>

Several defendants argue that the commission erred in permitting appraiser Batis' testimony under <u>Daubert</u>. Those defendants argue that Batis' opinions were subjective, unreasoned, unsupported by market data, and inconsistent with the established methodology of the real estate profession. We disagree that Batis' testimony should have been barred under <u>Daubert</u>. As the commission noted, "determining the value of real estate is not a science." <u>National Railroad Passenger Corp. v. Certain Temporary Easements</u>, 357 F.3d 36, 39 (1st Cir. 2004). Reliance on judgment and experience is an accepted appraisal technique, and Batis relied on this along with his assembly of matched pairs of sales between properties with and without a pipeline easement, and his interviews with market participants. While Batis' interviews and some of his market pairs lacked credibility (see Comm. Rpt. at 11), this is a question of weight rather than admissibility under <u>Daubert</u> (*see* Comm. Rpt. at 12 *citing* <u>United States v. 14.38 Acres of Land</u>, 80 F.3d 1074, 1077 (5th Cir. 1996)(questions relating to the bases and sources of an appraiser's opinion should affect weight rather than admissibility of testimony)).

Furthermore, defendants argue that Batis did not use an accepted appraisal technique because he failed to allocate an amount of damage to the remainder of the property, but, as the commission pointed out, Batis found no damage to the remainder and there was no need for him to allocate a zero.

Defendants argue that Batis failed to adhere to the instructions of this court because he failed to include the value of improvements on the land in his appraisals. The commission noted this, but held that while it weighed on the credibility of his testimony, it did not give cause to strike his testimony under <u>Daubert</u>. We agree. When assessing land with improvements, the commission generally took the fair market value of the appraiser who included the improvements. Furthermore, one of defendants' appraisers, McCann, also did not take into account improvements and explicitly cut them out of his appraisals, stating that the highest and best use of that portion of the property (farming) was different from the highest and best use of the remainder (residential development). Thus, we find that the commission properly admitted Batis' testimony under <u>Daubert</u>.

In the same vein, defendants argue that Batis' testimony should be stricken because of his advocacy position with Guardian and his lack of credibility due to faulty and inconsistent analysis. As stated above, Batis' lack of credibility is an issue that goes to the weight of his testimony, not its admissibility. The commission acknowledged the problems with Batis' lack of independence as an appraiser. The report discussed the fact that, contrary to the admonitions of <u>Real Estate Valuation in Litigation</u>, Batis appeared as an advocate for Guardian by being present at counsel table during the entire proceedings, being referred to as part of the "trial team," and being paid a considerable amount of money for his appraisals. The commission took this into consideration in determining the weight of Batis' testimony. (Comm. Rpt. at 14). We find that the potential prejudice that may have occurred had this been a jury trial was not present here as the commission correctly took these issues into account in its determinations.

The Cinquino defendants argue that Batis was allowed to offer rebuttal testimony

which was not disclosed either in his report or in his deposition, and which critiqued Harrison's testimony regarding his paired sales. Defendants presented this motion to the commission, and the commission denied it (Tr. 1415), but allowed defendants to depose Batis on these opinions and to recess in order to consult with Harrison and to prepare for cross-examination. (Tr. 1457-59, 1504-7). The commission further permitted defendants to defer Harrison's rebuttal testimony until he had a chance to go over the opinions of Batis. Harrison subsequently provided a written response to Batis' criticisms and testified in rebuttal on September 30, 2003, and October 1, 2003. We find that the commission's actions successfully cured any prejudice that may have occurred by permitting Batis to testify to previously undisclosed opinions.

Joseph Magdziarz

The Porter defendants object to the admission of Guardian's appraiser, Magdziarz, for the same reasons they object to the admission of Batis' testimony. Thus, for the reasons cited above regarding Batis' testimony, we overrule defendants' objections to Magdziarz. We find that the commission adequately addressed those issues and took them into account when weighing the credibility of his testimony.

Guardian's Objection to the Admission of Testimony of Defendants' Appraisers

Guardian objects to four of defendants' appraisers, Frank Harrison, Arthur Sheridan, Charles Southcomb and Michael MaRous. As Guardian's objections generally pertain to all appraisers, we address those objections at once.

Guardian argues that the appraisers' reliance on their experience is not sufficient, absent some hard market data. Guardian fails to note that the appraiser with the most market data was in fact Harrison, who assembled information on the sale of 160 properties with and

without a pipeline. (Comm. Rpt. at 10). From the sales, he created a Pipeline Sales Book that contained approximately 40 matched pairs of properties. (*Id.*) This is an acceptable appraisal technique. (Tr. 66-67). While the commission did note certain flaws in Harrison's data, this goes to the weight of the evidence, not its admissibility. Harrison's reliance on his experience does not render his testimony any less admissible than it did for Batis and Magdziarz.

Guardian objects to Sheridan's testimony not only because of his alleged lack of market data, but because he had no personal experience developing pipeline properties. The commission noted that Sheridan is a senior member of the National Association of Independent Fee Appraisers and a member of the International Right-of-Way Association, and that he has appraised property for companies such as Shell Oil, Amoco and Phillips Petroleum. (Tr. 2465; Comm. Rpt. at 35). He also has experience developing a substantial amount of properties. (Tr. 2531). While he had not developed any pipeline properties himself, Sheridan relied on numerous interviews with market participants, other developers, realtors and engineers. This is similar to Batis' reliance on interviews with market participants. (Tr. 2470-73, 2494, 2533). Sheridan also provided three matched pairs for review, and though the commission determined that these pairs were not credible, that was an issue that went to the weight of Sheridan's testimony, not its admissibility. (Comm. Rpt. at 36-37). Sheridan's heavy reliance on his experience did not make his testimony inadmissible under Daubert.

Guardian further objects to the testimony of Southcomb and MaRous because both failed to supply market data for their assertion of major damages to the remainder property, instead relying on their experience. While there were notable problems with the opinions of both experts, we find the commission's admission of their testimony to be well within its discretion. The deficiencies in defendants' appraisers' testimony was well noted and obviously

considered by the commission as it did not award defendants the vast remainder damages defendants claimed they had suffered. Thus, Guardian's objections are overruled.

Rodney Tonelli

The Figliulo defendants object to the admission of the testimony of Rodney Tonelli, a land planner for Guardian. They argue that Tonelli was permitted to testify regarding opinions specific to one of the Figliulo defendant's tracts – the Twin Gardens tract – which were not disclosed in the expert report prepared by Guardian, and that, as a land planner and not an engineer, he did not have sufficient background or education to rebut the testimony from defendants' engineer regarding the development of the Twin Gardens tract. The defendants argue that they objected to this testimony at the hearing and moved to strike it at the conclusion of Tonelli's examination. They argue that the commission failed to rule on their motion and so they are renewing it now before this court. However, the commission did rule on this motion in its report. The commission noted the existence of the motion to strike all testimony specific to the Twin Gardens tract that was not disclosed in the expert report. (Comm. Rpt. at 205-06). The commission then stated that it did not consider this testimony in its determination, but solely the general testimony of Tonelli that was disclosed. (*Id.*) Thus, defendants' motion barring all testimony specific to the tract was granted and we need not revisit the issue.

Objection to Commission's Articulation of "Path" Taken

Guardian and all defendants claim the commission failed to articulate the path it took in forming its just compensation determinations. We disagree. First, we note that "the commissioners are not required to explain the exact thought processes they utilized, nor are they required to develop and apply a mathematical formula that can be programmed,

computerized and then reviewed by the district court like an algebraic equation. United States v. 573.88 Acres of Land, 531 F.2d 847, 849 (7th Cir. 1976). However, contrary to Guardian's assertions, the commission did not just pick numbers out of thin air, but followed a detailed and transparent path by which it determined just compensation.

The commission began its report by generally tracking the litigation to the point of the appointment of the commission. (Comm. Rpt. at 3-8). It then discussed common issues dealing with numerous Daubert motions to exclude expert witnesses, and gave detailed analysis as to why certain of those motions were granted while others were denied. (Comm. Rpt. at 9-16). During this portion, the report went over many of the general features of the experts' testimony, its merits and deficiencies. The report then laid out the path by which the commission determined just compensation. It outlined eight steps, which included (1) commission's viewing of the property, (2) hearing testimony and observing demeanor of witnesses, and weighing testimony accordingly, (3) determining highest and best use of the property before impressment, (4) determining fair market value of the property before impressment, (5) considering the characteristics of the easements, (6) determining the highest and best use of the property after impressment, (7) determining fair market value after impressment, and (8) determining just compensation by subtracting the fair market value of the property after impressment from the fair market value before impressment. (Comm. Rpt. at 19-26).

The commission went into great detail regarding (7), discussing the vast differences in value accorded by defendants' appraisers versus plaintiff's appraisers. It discussed the paired sales presented, as well as the possibility of development contributing to a higher fair market value. In the same vein, it discussed the issues of loss of design flexibility and loss of lots. It

also talked about the testimony offered regarding stigma attached to owning pipeline property. In discussing these issues, the commission put forth its opinions regarding the credibility of the relevant testimony and evidence. It concluded that "an award should be related to the value of the land, the amount of land encumbered and the significance of the intrusion." (Comm. Rpt. 26). It considered "the fact that the landowners were entirely deprived of the use of the property in both the permanent and temporary easements during construction." (*Id.*) Additionally, "in valuing the temporary easements, [it] considered evidence of rental value of the farm properties and, where presented, evidence of fair rates of return on the acreage that was encumbered." (*Id.*)

The commission then divided up its report by parcel, and thoroughly dissected the testimony of the witnesses relevant to each piece of land. The report laid out all steps for each parcel, and concluded that based on the testimony, the commission's viewing and the path laid out (which comprehensively talked about problems with the testimony from all sides), just compensation was neither as high as defendants' experts opined (for the numerous reasons cited throughout the report), nor as low as plaintiff's experts opined (which was also laid out in various places in the report). This level of specificity is sufficient in light of the caselaw. *See* United States v. 124.84 Acres of Land, 387 F.2d 912, 913 (7th Cir. 1968); United States v. Certain Parcels of Land, 384 F.2d 677 (4th Cir. 1967); Chandler v. United States, 372 F.2d 276, 280 (10th Cir. 1967). Based on this, we find that the commission sufficiently laid out its analysis regarding its just compensation determinations.

Objection to Commission's Just Compensation Determinations

We turn now to the objections regarding the commission's just compensation determinations for particular tracts of land. We begin with Guardian, followed by the various

defendants. Where both Guardian and the defendants object to the valuation of a certain tract, we deal with those objections together.

First, Guardian argues that the commission erred in considering that the defendants were deprived of their use of the portions of land in question during the period of construction. It argues that the commission conceded that construction took only six months, and during that period defendants had at all times access to the land. While defendants could not farm that portion of land, Guardian was required to pay for resulting crop damages separately, so that should not have been considered in the commission's decision. We disagree with Guardian that the commission erred in considering defendants' lack of access. We can hardly see how, during the period of constructing a natural gas pipeline, defendants had unfettered access to that portion of the land. Guardian had condemned temporary easements for the construction, and most certainly had moved in large excavating equipment. It also needed to have dug a large trench in which to place the pipe. For a number of defendants, this trench prevented them from accessing the land on the other side of the easement during the period of construction as well. We also cannot agree that Guardian would have permitted defendants to come on that portion of land at any time during construction, if for no other reason than for safety and liability concerns. Guardian also argues that the "date of valuation" requirement prohibited the commission from considering the actual construction of the pipeline and thus defendants' lack of access. We disagree. It was clear on the date of valuation that the pipeline would require construction – that it would not just appear out of thin air. Furthermore, the commission considered a number of issues which arose after the date of valuation, and many

of the conclusions drawn from that consideration were in Guardian's favor.[11] We do not see Guardian arguing against the commission's consideration of those issues. Thus we find the commission did not err in considering defendants' lack of access to, and deprivation of use of, the land during construction.

Guardian argues that the commission erred because, since it rejected all of defendants' arguments regarding remainder damage, there was no reason for the commission to award anything more than the actual value of the easement taken, as Guardian's appraisers testified. We disagree that the commission completely rejected defendants' opinions regarding remainder damage. What is clear from the report is that the commission rejected not the concept of damage to the remainder but the amount of damage to which defendants' appraisers testified.[12] Thus the commission did not err in awarding defendants more than what Guardian's appraisers' believed was just compensation.

The Cinquino defendants argue that the commission erred in not accepting Harrison's matched pairs, not taking into account the unique characteristics of the land, and not following this court's instructions to include remainder damages and accept testimony of those damages from property owners. We overrule these objections.

The commission did consider Mr. Harrison's paired sales and credited him on his preparation of the sales book. However, the commission did not accept his testimony wholesale because he failed to explain how he determined fair market value after impressment on these properties, "especially given the effect of investor speculation on land prices in the

---

[11]For example, regarding the Twin Gardens tract, the commission considered the fact that, after the date of value, the Motorola plant which had spurred so much development in the area, closed.

[12]In discussing defendants' appraisers' reasons for loss of value after impressment, the commission stated that "defendants did not present persuasive evidence that these factors together or separately caused a decrease in fair market value *to the extent* that their appraisers claimed," (Comm. Rpt. at 23).

general market area of most of these properties." (Comm. Rpt. 35). The commission noted that Harrison found a reduction of eight percent in the fair market values of two different properties, one of which was already impressed with a pipeline prior to the Guardian impressment and one which was not. (*Id.*) The commission also noted the wide variance in Harrison's reductions in value, which ranged from five to twenty-five percent of the fair market value. (*Id.*) He also failed to investigate the terms of the various pipeline easements to determine the effect of those terms on the fair market value of the property. (*Id.*)

The commission also did take into consideration the uniqueness of the land and the consideration of damages to the remainder. The Cinquino defendants point to numerous properties to demonstrate the commission's alleged "arbitrary and capricious" award determinations. In their arguments, defendants misstate the amount of the taking by conflating the acreage of the temporary easements into that of the permanent easements, which the commission noted that it valued differently. Additionally, that the commission did not accept Harrison's valuation wholesale does not mean that it did not consider remainder damages on these properties. It did consider there to be some damage to the remainder because every award by the commission exceeded Batis' valuation, and Batis consistently found no remainder damages. Based upon our independent review of these properties, we find that the commission did not err in its just compensation determinations.

JIR Partnership and RJ Partnership Tracts

Both Guardian and the Cinquino defendants object to the commission's award, though they obviously differ as to what the correct award should be. Guardian argues that the commission's award cannot be sustained because it is based entirely on the testimony of defendants' appraiser Sheridan, who had no meaningful data and had no personal experience

developing pipeline properties, and thus the commission should have accepted the testimony of Batis.[13] Sheridan relied on three sets of paired sales to support his opinion. The commission noted deficiencies in these sales, but did not disregard them. (Comm. Rpt. at 36-37). Additionally, merely because an appraiser has no experience developing a pipeline property does not mean he or she cannot give an expert opinion as to the appraisal value of that property. It is not a requirement of an appraiser that he or she have developed properties at all, let alone the specific type of property at issue. Sheridan also had a large amount of experience appraising land for oil and gas companies. (Comm. Rpt. at 35). The commission properly evaluated Sheridan's testimony, including its deficiencies, in determining just compensation. Even if the commission had rejected Sheridan's testimony, it is a false dichotomy for Guardian to argue that the commission must then accept the testimony of Batis. The commission did not rely solely on the testimony of these witnesses in making its determination, but on many factors, including their own viewing of the property. Furthermore, simply because a witness' testimony may be "uncontroverted" does not mean that it must be accepted wholesale. See Vector Pipeline L.P. v. 68.55 Acres of Land, 157 F. Supp. 2d 949, 953 (N.D. Ill. 2001). The commission noted in its report the many problems with Batis' testimony generally, including his apparent bias towards Guardian, which we noted above. We overrule Guardian's objections.

The Cinquino defendants argue that the commission erred in accepting Batis' highest and best use for these properties – to hold for investment – rather than that of Sheridan – as a planned unit development with mixed commercial and residential units. We do not agree.

---

[13]To the extent that Guardian and several of the defendants makes this argument *mutadis mutandis,* regarding other properties, we reject those arguments for the same reasons cited here.

Both tracts of the JIR property are zoned agricultural and are currently being farmed. (Comm. Rpt. at 85). The northern tract contains a pond and part of the property is in a flood zone. (Tr. 3111). There are also three Natural Gas Pipelines on that tract. (*Id.*) The southern tract is bisected by a commercial railroad, whose trains run 3-4 times a day. (Tr. 2712, 2715). Sheridan testified that because of the way the railroad tracks were constructed, one would not be able to cross them, and all traffic would have to be directed outwards toward the roads. (Tr. 2714). Some areas of the southern tract are wetlands. (*Id.*) Sewer and water are at least a mile and-a-half away (tr 2574).[14] While the northern portion of the property borders I-80, there is no exchange at that point and Sheridan testified that he was unsure one was likely to be developed, despite the fact that Minooka's Comprehensive Plan showed an exchange. (Tr. 2578). Additionally, Sheridan stated that while the nearby village of Minooka was developing, it was behind the other towns in the area in terms of rapid development. (Tr. 2576). The commission determined, based on these factors, other testimony and its own viewing of the property, that development was unlikely to occur within three to five years from the date of value. We agree. We find the commission did not err in determining that the highest and best use of the JIR property was to hold for investment.

Similarly, development of the RJ property was unlikely in the near term from the date of value. That property was in a currently unincorporated area of the county zoned for agricultural use, and was being farmed. (Comm. Rpt. 88). The property contained a creek and some flood plain, and four different pipeline easements other than Guardian's. (Tr. 3122-24). It was a quarter of a mile away from the Village of Shorewood and thus had sewer and water

---

[14]The report mistakenly states that sewer and water are a quarter of a mile away, and cites to page 2549 of the transcript for this proposition. However, that testimony was regarding sewer and water access to the RJ property, not the JIR property. (Comm. Rpt. 86).

nearby. (Tr. 2549-50). However, though it had some frontage on I-80, there was no direct access to the expressway, and one would have to travel at least a mile and-a-half to access an interchange. (Tr. 2704-07). Sheridan testified that he was unsure that a closer interchange would occur in the near term. (Tr. 2727). We find that the commission did not err in determining that the highest and best use for the RJ property was to hold for investment. Therefore, based on our *de novo* review of the evidence, we overrule the parties' objections and uphold the just compensation determination of the commission related to these tracts.

Hitzsche-Palazzolo Tract

Guardian objects to the commission's determination, arguing that because the commission found defendant's witnesses unpersuasive, it should have adopted the testimony of Batis. We rejected that argument above. The commission found time and time again that Batis' testimony was flawed, and that he appeared a biased witness. The Krentz defendants (of whom this defendant was one) also established Batis' bias. (Tr. 1751-54). Batis, who found no damage to the remainder in any of the properties in this condemnation hearing, had been previously retained by a landowner defendant in another action. (*Id.*) There he testified that the imposition of a gravity flow water pipe reduced the property's fair market value by nearly half. (*Id.*) Batis' opinions have been clearly discredited and the commission was right to not adopt them.

Guardian also objects to the commission's allegedly "off hand" factual finding that the Lakehead resales, used as comparables by several appraisers, were true market transactions. The Lakehead properties were a group of properties that were privately purchased by a pipeline company, Lakehead, and were not obtained through condemnation proceedings. (Tr. 101-104). Thus, Lakehead had to negotiate with the buyers and often paid well above market

value for the land. Both Harrison and Batis determined that these sales were not market transactions because they did not reflect the actual market value of the land. (Tr. 102, PX 8A). Guardian argues that the resales of the impressed land by Lakehead were also not market transactions. Harrison and the commission found otherwise. (Comm. Rpt. at 33; Tr. 102, 317-20, 2277). Guardian argues that the commission based this finding on Harrison's testimony, who, Guardian alleges, never investigated Lakehead's motivation for selling off the property. Guardian alleges that the commission completely ignores the testimony of Batis in this regard, despite the fact that he did investigate the sales and was informed that Lakehead was attempting to dump the properties, thus making them unreflective of the market. We find that Guardian mischaracterizes the commission's report and the testimony on which it is based.

Harrison spoke with one of Lakehead's real estate brokers and two purchasers of Lakehead properties, and found no basis to believe these were not market transactions. (Comm. Rpt. 33; Tr. 102, 317-20, 2277). Batis testified that everyone that he spoke with knew that Lakehead was attempting to dump the properties on the market, making their resale values not proper market transactions. (Tr. 1950). However, as the commission noted, Batis relied solely on the statements of Marlene Henricy, whose daughter purchased a 10-acre parcel of land for far less than what the original owner was offering to repurchase the parcel from Lakehead (PX 8A). The other interviews Batis conducted involving Lakehead property (with attorney Krandel, owners Ratcliffe, Hansen and Sullivan) do not give sufficient information regarding the resale of the Lakehead properties to determine whether they were market transactions. (*Id.*) These interviews focus on the initial sale by the owners to Lakehead. (*Id.*) We find that the commission was correct in determining that the Lakehead resales were typical market transactions and that Harrison could rely on those resales in his analysis. We find, based on

our *de novo* review of the evidence, that the commission correctly determined just compensation for this tract of land.

<u>Twin Gardens Tract</u>

Guardian objects to the commission's award determination, asserting the same argument we addressed above regarding the need to accept Batis' appraisal after the commission found defendants' experts to be unpersuasive. We note that the commission did point out the deficiencies of this expert's testimony, but on no occasion did the commission disregard that testimony in its entirety. (Comm. Rpt. at 202-203). The commission also found Batis' general points unpersuasive with respect to this specific property. (Com.. Rpt. at 208). Guardian argues that there is no other evidence that the commission could rely on in determining the award amount, but, as we stated above, the commission had sufficient evidence to determine the award, including comparable sales and its own viewing of the property.

The Figliulo defendants argue that the commission erred in ignoring the testimony of its civil engineer, Hamilton, who put forth various land plans, all of which required numerous crossings of the pipeline with roads and utilities. He opined that the impressment of the easement would increase development costs by $441,000. We do not agree that the commission "ignored" Hamilton's testimony. We find that the commission simply did not believe that, even given these costs, the fair market value of the land would be reduced as significantly as defendants' experts opined. Guardian's land planner, Tonelli, testified that, generally, properties with pipelines can be developed in various ways and that a pipeline was not a substantial impediment. (Tr. 9060-2). This is borne out by the fact that neither the Concord contract for the sale of the land to a developer (which did not close), nor the Terrestris contract (which did close), contained a contingency for the cost of crossing the pipeline or reductions in

sale price of land encumbered by the pipeline. (Tr. 8655, Comm. Rpt. at 204).

Defendants also argue that the commission erred in criticizing defendants' appraiser, MaRous, for not performing a matched pair analysis when the commission criticized Harrison's matched-pair analysis because he was unable to find truly matched sales. It is not true that the commission criticized Harrison's matched-pair analysis for his failure to find perfectly matched pairs. The commission considered the professional literature on appraisal which states that it is problematic to find truly matched sales, given the uniqueness of land. (Comm. Rpt. at 22). Appraisers typically make adjustments to the sales to account for the differences among properties. What the commission criticized was not the matched sales presented by defendants' appraisers, but the appraisers' failure to present evidence on what, if any, adjustments they made to the properties to account for the differences in those properties. (*Id.*). Their failure to do so made the comparison of those sales less reliable. Additionally, the commission criticized defendants' appraisers for failing to present sufficient analysis of whether the pipeline easements that existed in the matched pairs had terms similar to those of the Guardian easement. (*Id.*).

Mr. MaRous, on the other hand, failed to do any matched-pair analysis, and testified that this was because he was unable to find "exact comparables." (Tr. 8683-84, 8688). But as the commission noted, exact comparables were not required by even the strictest appraisal standards because such exactness is impossible and because appraisers can make adjustments to account for differences. (Comm. Rpt at 202). MaRous' failure to present any market data, then, made his opinion all the less credible.

The Figliulo defendants argue that the commission erred in determining that the highest and best use of the property was to hold for investment, given the overwhelming evidence that

the property was ready for development on the date of value. Defendants cite to MaRous' testimony that Twin Gardens was already annexed into the City of Harvard and zoned for development, that sewer and water were available, and that the property was under contract to a developer. However, as the commission noted, the Motorola plant that had been the spark to the wave of development in Harvard, closed about five months after the date of value. (Tr. 8601). Additionally, the Twin Gardens tract is very large, 490 acres of land, and MaRous' testimony indicated that it would be divided into about 130 acres of commercial, and 360 acres of residential space, with approximately 1,200 dwellings. (Comm. Rpt. at 202-203). Yet, Magdziarz testified that in 2001 the City of Harvard had only issued 52 building permits for single family residences, and 65 permits in 2002. (Tr. 8752). MaRous admitted that he did not believe that Harvard was ready to absorb 130 acres of new commercial development or 360 acres of residential development on the date of value. (Tr. 8688-90). He stated that development of the entire tract would take between six to ten years. (Tr. 8691). Thus the commission correctly determined that the highest and best use of the property was to hold for investment.

Finally, defendants argue that the commission erred in not considering the testimony of Mr. Duggan, the owner, who the commission recognized as a knowledgeable and experienced real estate investor and developer, and who opined that the property was diminished in value by $1,370,000. Again we find that the commission did consider Duggan's testimony, but did not find it overly persuasive. The commission noted that Duggan found the presence of the easement to affect the selling price of his land, but failed to explain how it did so. (Comm. Rpt. 8966-7). We agree. His failure to explain his reasoning prompted the commission to find his testimony less than persuasive. We do not believe the commission erred in this respect. Based on these considerations, and on our *de novo* review of the evidence, we find that the commission

was correct in its just compensation determination.

Fisk Tract

The Cinquino defendants argue that the commission should have disregarded Batis' testimony that the highest and best use of the property was for agricultural purposes, because this did not comport with this court's instructions in that it ignored the fact that the Fisk property had been incorporated in the Comprehensive Plan of the Village of Sycamore. However, the commission did in fact disregard Batis' highest and best use of the property, and adopted defendants' appraiser Harrison's highest and best use, which was residential development, consistent with the Comprehensive Plan, with interim agricultural use. (Comm. Rpt. at 67-68).

The Cinquino defendants also argue that the commission erred in its calculation because it failed to consider the subdivision plat which showed the effect of the pipeline on the property. It is not clear from the report that the commission failed to consider the plat. The plat is noted in the report, which makes it appear that it was considered. (Comm. Rpt. at 68, 69). The commission then notes that despite the existence of the plat, defendants did not present evidence of specific additional costs or a loss of lots attributable to the easement. (*Id.*) Defendants did present a second plat during their cross-examination of Batis that showed a similar subdivision without the pipeline, which included 16 more lots. While comparing just these two plats might demonstrate a loss of lots, as Batis stated, these are clearly not the only two ways the property could be developed.

We find that the commission's just compensation determination appeared to center more on the recipient of the just compensation, a concern with which we agree. (Comm. Rpt. at 69). The name "Fisk" is a bit of a misnomer as the Fisks did not own the property, nor were the

Fisks the defendants in this action. (Tr. 2100). In fact, after the condemnation complaint was filed, the Fisks had sold the property to a man named "Boose". (Tr. 2085-86, 2095-2099). At the time of the sale, Boose knew that the pipeline was going to be installed and he paid a price of about $1000 less per acre than the property's fair market value before impressment. (Tr. 2095). The commission addressed this issue in the hearings, pointing out the problem with awarding just compensation for depreciation in value to a person who did not suffer the injury, but in fact prospered by obtaining the land at a reduced price. (Tr. 2097-2100). The Cinquinos argued that the issue here was the value of the land only, and not the owner of the land. (Tr. 2098-2100). However, the very purpose of just compensation is to place the owner of the property in the position he or she would have been in had there been no taking. United States v. 564.54 Acres of Land, 441 U.S. 506, 510 (U.S. 1979). Here, the owner, Boose, was not injured by the impressment of the easement, as he had paid a reduced amount for the land based on it being impressed.[15] Thus, based on our *de novo* review of the evidence, we find that the commission correctly determined the award for just compensation.

Mantia Tract

     The Cinquino defendants argue that the commission erred in not adopting Sheridan's highest and best use of the property. Sheridan opined that the highest and best use was commercial and residential development. He testified that the Comprehensive Plan of the Village of Channahon was in accordance with this opinion and that because this property is on

_____

[15]If anything, it was the Fisks who were injured. Defendant's counsel noted that it was not sure where the award would go – whether it would go to Boose, or perhaps to the Fisks as part of the sales contract on the land. Yet, as the Supreme Court has noted, "it is undisputed that [since] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment." United States v. Dow, 357 U.S. 17, 20-21 (U.S. 1958) Counsel represented Boose, not the Fisks, and we found no place in the record where the question was settled as to who received the award. We assume, as perhaps did the commission, that Boose retains the just compensation award as he was the owner of the property on the date of value.

the village's border, sewer and water were immediately available. (Tr. 2592-94). However, as the commission noted, this use would require annexation and rezoning by the village, neither of which had occurred on the date of value. (Comm. Rpt. at 83). Additionally, development of the property required the construction of a road that would give greater access to the property (Tr. 2631), as the property was currently only accessible on the west side and was separated from Route 6 by an intervening landowner's property, as well as a strip of land owned by a pipeline company in fee simple. (Tr. 3080-81). On the date of value, that road had not been approved or funded. (Tr. 2732-33). Based on our *de novo* review of the evidence, we find that the commission did not err in its just compensation award regarding the Mantia property.

MacKenzie-Taylor Tract

The Cinquino defendants similarly argue that the commission should have accepted Sheridan's opinion as to the highest and best use of the MacKenzie-Taylor tract. Sheridan opined that its highest and best use was for a planned unit development with mixed commercial and residential uses. (Tr. 2508). He testified that the land was immediately adjacent to the Village of Sandwich and utilities were right across the road. (Tr. , 2220, 2508-9). Harrison testified that Sandwich's Comprehensive Plan designated part of the small northerly strip and the southwesterly 30-35 acres as commercial with the balance of the land designated as mostly open space with parks and detention basins. There would also be some low density residential housing. (Tr. 2217). However, Sheridan was not comfortable that the area would develop as commercial space. (Tr. 2693). The commission agreed that the space would eventually develop with mixed uses, but not within the three to five years of the date of value that defendants' appraisers opined. We agree. The property is currently zoned for agriculture, includes a farmstead and outbuildings, and is currently being farmed. (Comm. Rpt. at 94). While

Sandwich is contiguous with this property, on the date of value it had not been annexed. (Tr. 2216). Seventy-five percent of the northerly strip is Zone A flood plain, and the creek that runs through it also runs through a portion of the southern tract. (Tr. 2200, 2215-17). There is also another pipeline already in place on the property, whose easement is broader than Guardian's. (Tr. 3027; Comm. Rpt. at 94). We find that all of these factors lead us to agree with the commission that the highest and best use of the property on the date of value was to hold for investment.

The Cinquino defendants also argue that the commission failed to award compensation for a valve site taken on the property in fee simple. We disagree. While the commission did not separate out the compensation for the valve site from the compensation for the easements, it discussed the valve site in its report. (Comm. Rpt. at 93-98). It proceeded similarly regarding other tracts that had valve sites condemned. (*See* Comm. Rpt. at 153). We find the commission did follow the instructions of this court regarding the valve sites. Based on our independent review of the evidence, we find the commission correctly determined the just compensation award for this tract.

Ed Sass South Tract/Rood Tract

The Porter defendants argue that it is apparent from a comparison between the Ed Sass South Tract and the Rood Tract that the commission did not utilize a common approach in determining just compensation owed. They argue that these two properties are similar in size, the Ed Sass property being 60 acres and the Rood property being 76 acres. They are situated close to one another and have similar land characteristics. The permanent easements taken in both cases were approximately three acres, and the pipeline ran, in both cases, 50 feet from the property line. Yet, the commission awarded the Ed Sass defendants $10,000 in just

compensation and the Rood defendants $26,000. But the defendants, in their comparison, left out one major difference between these two properties. The Ed Sass South property is situated approximately one mile west of Illinois Route 23 and two and-a-half miles from Interstate 90, while the Rood property is situated only several hundred feet from I-90. (Comm. Rpt. at 138, 144). While the commission noted that there is no entrance to the expressway at that point yet, this factor convinced the commission that development would likely reach the Rood property before it reached the Ed Sass South property, and thus rightly determined that the loss in value of the Rood defendants was greater than that of the Ed Sass defendants. Defendants' objection is overruled.

<u>Schultz Tract</u>

The Porter defendants contend that the commission's report must be rejected because it fails to set forth a path used in determining the just compensation award for the Schultz property and is inconsistent within itself as to the actual acreage of the easement taken on that property. Defendants point out that the appendix to the report provides three tract maps relating to the Schultz properties, and the easements taken according to those maps total 11.13 acres in permanent easements and 18.51 in temporary easements. They argue that these easement areas were the ones utilized by both defendants' appraiser, McCann, and Guardian's appraiser, Magdziarz. The commissioners calculated the permanent easements at a total of 9.64 acres, and the temporary easements at 16.93 acres. Defendants argue that this inconsistency is just another reason the report should be rejected. However, defendants are mistaken that their appraiser adopted the easement areas from these tract maps.

McCann testified that the permanent easement taken in the northern tract totaled 4 acres, and in the southern tract 5.5787 acres. (Tr. 4370, 4390). This adds up to 9.5787 acres,

which is less than what the commission calculated. Likewise for the temporary easement area, which McCann calculated as 6.39 for the north parcel and 9.8081 for the south parcel, totaling 16.9181 acres. (*Id.*) The commission's calculation of the easements taken are extremely close to the testimony of defendants' appraiser, and actually slightly more. Therefore, we overrule defendants' objection.[16]

### Drolsom Tract

The Figliulo defendants contend that the commission erred in its just compensation determination regarding the Drolsom tract because it permitted Batis to testify about two pre-existing easements which were not noted in his report, and because Guardian called Mr. Drolsom as an adverse witness without notice to the defendants. We overrule both objections.

While Batis did not include the pre-existing ComEd and NICOR easements in his report, and thus Guardian never disclosed that he would testify about them, this defendant cannot claim that the presence of these easements was an unfair surprise to him. Defendant knew about these easements – they exist on defendant's land. Furthermore, defendant's appraiser knew about these easements, and their existence was brought out on cross-examination. (Tr. 8208, 8215). Thus, we do not find that the commission's decision to permit Batis to testify about these easements unfairly prejudiced defendant.

Secondly, there was no unfair prejudice to defendant when the commission permitted Guardian to call Mr. Drolsom as an adverse witness. As Guardian points out, Mr. Drolsom was listed as a defense witness, and only at the last minute did defendant decide not to call him.

---

[16]The Porter defendants also argue that the report was arbitrary in its award determination when one compares the just compensation awarded to the Schultz defendants with that awarded to the Cosman defendants. Defendants base this argument on the easement of the Schultz tract totaling 11.13 acres. Because we determine that the correct acreage of the easement was 9.64 acres, we find no inconsistency between the awards given to these two tracts.

Because he was listed on the witness list for defendant, he was fair game for becoming an adverse witness when defendants decided not to call him. Defendant cannot claim unfair surprise at the commission's decision to permit his testimony.

Defendant also contends that the commission mistakenly reported that Harrison's loss of value to the property was $190,000 when it was actually $198,000. They claim that had the commission correctly stated Harrison's figure, that might have changed its just compensation determination. We do not agree. While the commission did mistakenly state Harrison's figure, and find the percentage of the reduction in value to be 8% based on that figure, rather than the 9% that it should have been, we do not believe that this made a difference in the commission's finding, as the report correctly stated Harrison's before impressment fair market value at $2,508,000 and his after impressment value at $2,310,000, the difference of which is $198,000. (Comm. Rpt. at 200). The commission determined that fair market value of the property after impressment was $2,459,500, and we find, based on our *de novo* review of the evidence, to be the correct amount, and thus the commission did not err in its award despite the mistake in the report.

Morrissey Tract

Defendant Morrissey objects to the commissions just compensation determination on his property for several reasons. Defendant argues that the commission erred in determining that the highest and best use of the property was to hold for investment. He argues that the moratorium on annexation into Minooka happened after the date of value and therefore was not relevant.[17] However, defendant testified that he did not go forward with his plans to develop in the late fall of 2002 because he stopped to take care of his ailing mother and because

---

[17]Defendant Morrissey elected to use the alternate date of value of February 5, 2003.

his son, who was helping him, had a serious ear operation. (Tr. 10737-38). He became aware of the moratorium after these medical problems, but does not testify that these interruptions in his plan to develop ended before the moratorium was put in place. (*Id.*). His property was not annexed to Minooka on the date of value. We find the commission did not err in considering the moratorium on annexation in its determination.

Defendant argues that development had reached the property and thus its highest and best use was for residential development. He notes that water and sewer were ready to serve the property and the plans for the property were consistent with the 2002 Minooka Comprehensive Plan. However, despite the moratorium, the fact that these preconditions for development were in place do not make it "certain" or even "reasonably probable" that the land could have been developed on the date of value. First, sewer and water, while close by, did not abut the property. Rodney Tonelli, Guardian's land planner, testified that while sewer and water were 1,600 feet away, there were intervening properties between them and the Morrissey property. (Tr. 11504). Furthermore, Minooka's sewage treatment plant lacked the capacity on the date of value to service defendant's property, and while construction was underway in 2005 to increase capacity, it was unclear when that would be completed. (Tr. 10883-84, 11503-4).[18] Tonelli testified that the development plans presented by defendant were not feasible, as they would require drastic filling of flood plains and floodways – leveling a bluff[19] to incorporate a

---

[18]Defendant argues that his witness Crag Hullinger, the former Village Administrator of Minooka, testified that the sewage treatment in place on the date of value had the capacity to support development of the Morrissey tract. This is not a complete picture of his testimony. Upon further cross-examination it came out that the plant had the capacity for those plots of land under development in 2003-05, none of which were the Morrissey tract, and that since then the plant has had to be expanded. (Tr. 10882-84).

[19]Defendant contends that this is not a "bluff" but a wooded hillside. Regardless of what the parties call it, the topographical map indicates a stark elevation change in the northwest corner of the property. (Comm. Rpt. at 244).

street, backing up lots along the ComEd right-of-way, and relocating a stream that Tonelli testified government regulations would prohibit.[20] (Tr, 11444-11496). This testimony was not controverted by defendant's civil engineer. (Tr. 11108-10, 11124-30). Tonelli also testified that the number of lots incorporated in the plan were not achievable because they did not meet the zoning requirements for minimum lot size of the Village of Minooka. (Tr. 11496-98). He testified that the Minooka Comprehensive Plan actually called for everything south of the ComEd right-of-way to be used as open space and the land north of it to be developed as residential conservation subdivision, with a density of two units per acre. Additionally, defendant testified that he used to use the part of the property where the pipeline was impressed as an apple orchard and nature trails, but now would not use that part of the property because he did not feel it was safe. (Tr. 10743-45). We agree with the commission that this contradicts his testimony that he plans to develop the entire tract for residential housing. For all these reasons, and based on our independent review of the evidence, we find that the highest and best use of the Morrissey tract on the date of value was to hold for investment.

Defendant argues that the commission applied an "inevitability" standard to the highest and best use determination, and that this is an incorrect standard, and an impossible one to meet. We do not agree that the commission required such a high standard. It is clear from the issues defendant raised and the commission's determinations that the commission adhered to the required standard of "reasonable probability," (Washington Metropolitan Area transit Authority v. United States, 54 Fed. Cl. 20, 33 (2002)), and that it found that on the date of value

---

[20]Defendant argues that Tonelli was not qualified to testify on the filling of flood plains because he is a land planner and not a civil engineer. However, Tonelli testified that he had experience with the requirements of filling flood plains, and was not testifying to specific amounts of dirt that would need to be used, but in more general terms such as cost, which we agree he is qualified to testify about.

it was not reasonably probable that the Morrisey tract's highest and best use was for residential development, as defendant argues it was.[21]

Defendant argues that the commission erred in excluding his appraiser Southcomb's matched pair analysis on technical grounds. He argues that the commission's rejection of this analysis comes from its refusal to treat defendants similarly to plaintiff in this proceeding and adopt the testimony from one defendant's portion in all the others, the way it did for Guardian. We find this argument to be without merit. The reason that Guardian was able to adopt Batis' testimony throughout the proceeding was that he was appraising the entire time for one party, Guardian. Furthermore, Guardian made Batis' general testimony available for cross-examination by all defendants. Southcomb was the appraiser for several different defendants. His testimony was specific to comparable sales relating to the Morrisey tract. In addition, there is no indication in the record that the defendant requested that Southcomb's earlier testimony be adopted in this proceeding.[22]

The commission's weighing of Southcomb's testimony relied on several deficiencies in his analysis, including his lack of awareness of several pipelines in existence on some of his comparable properties, and his failure to adjust for the differences between comparable properties. (Comm. Rpt. at 239-40). He also overstated Guardian's interest in defendant's tract and did not appear to understand the terms of the easement, making his appraisals less reliable. (Comm. Rpt. at 238).

For similar reasons we agree with the commission that Southcomb's subdivision analysis

---

[21] For the same reason, we reject defendant Wormley's argument that the commission's standard of persuasion was too high.

[22] It is notable that during the Wormley proceedings, counsel stipulated to all the proceeding testimony of Harrison regarding a number of other tracts of land surrounding the tract at issue. (Tr. 11847).

on the property lacked credibility. In making this analysis, as the commission noted, he "made numerous assumptions, including selling price of the lots, annual percentage increase in lot prices, sales expenses, administrative expenses, real-estate taxes and insurance, profit, discount rate, and absorption time." (Comm. Rpt. at 238). None of these assumptions was based on market data, which Southcomb conceded was available, but instead was based on his own experience. (Tr. 11335, 11340, 11345). Furthermore, his analysis was not credible because he believed that the easement area created a "no man's land" upon which nothing could be done. (Tr. 11256). While the easement language requires that no buildings be built, or trees planted, on a 30-foot portion of the 50-foot easement area (15 feet on either side of the center line), the area can be crossed with both utilities and roads. We find that the commission was correct in not relying on Southcomb's subdivision analysis, and we find from our *de novo* review of the evidence that the commission's just compensation determination for the Morrisey tract was proper.

<u>Wormley Tract</u>

Defendant Wormley objects to the commission's just compensation determination regarding his tract of land for several reasons. First, he objects because the Wormley tract is the only tract that the commission failed to view in this case. However, Guardian argues that this is because Mr. Wormley's counsel never requested a viewing, despite ample opportunity to do so and full notice of the process. We do not know why the commission did not view the property, but we do note that at the outset of Mr. Wormely's hearing, no objection was made to the commission regarding its failure to view the property. In fact, counsel for the property offered the commission a "bit of background" on the property knowing that the commission had not seen it. (Tr. 11850).

Second, defendant argues that the commission improperly weighed the fact that the owner of the land did not testify to its value. We do not believe that the commission gave this any weight.   As we read the commission's report, it noted that Mr. Wormely had "been a developer and real estate agent in the county for 30 years," and had had "lengthy experience specializing in the sales and development of agricultural properties" throughout the county and northern Illinois. (Comm. Rpt. at 248). We find that the commission noted his silence on value simply because the commission may have found him to be qualified to testify on the subject given his vast experience.   The commission may have also noted this because it found the testimony of defendant's appraiser, Arthur Sheridan, to be less than credible, thus leaving it with little credible evidence on the part of defendant as to the fair market value of the land and the reduction of that value because of the impressment of the pipeline. (Comm. Rpt. at 248-50).

Third, defendant argues that the act of expending $60,000 to provide a new building for a farming tenant and to drill a new well for the tenant's use is not inconsistent with a highest and best use of a residential planned unit development. We disagree.   While it is true that $60,000 is a negligible amount to expend when compared with the value of the property and the cost of its ultimate development, the goal of the commission is to determine what the highest and best use of the property was on the date of value. While interim farming was part of the highest and best use analysis by Sheridan, the idea that development would occur in the near term, as envisioned by defendant, is belied by the continued improvements on behalf of the farming tenant, which suggest a longer interim of farming, making the highest and best use of the property "to hold for investment."

Finally, defendant argues that the commission erred in focusing on the number of pipelines on the Wormley property rather than their relative locations.  We do not read the

commission's report as focusing exclusively on the number of pipelines. There are four pre-existing pipelines on the property. Sheridan, in his initial report, failed to note all but the Amoco line.[23] Even in his supplemental report, which includes a Lakehead easement and an ANR pipeline, Sheridan failed to note an additional ANR pipeline that runs parallel with the other ANR line. The commission found that because of this oversight, Sheridan failed to give an updated before-and-after valuation based on the existence of all the pre-existing pipelines. Defendant argues that it is not the number but the placement of the pipelines that is important, and the triangle of land created where the Guardian line departs from the Amoco line creates a portion of land that cannot be developed. However, such land also cannot be developed, according to Sheridan, when two pipelines run parallel to each other, such as the ANR pipelines, because of the amount of space between them. (Tr. 11944). Yet he dismissed his failure to account for the additional ANR pipeline in his report as not affecting the value of the land. (Tr. 11904-14). Additionally, the commission considered the actual terms of the various easements, which Sheridan failed to account for in his appraisal. (Comm. Rpt. at 251-52; Tr. 11915, 11919-21). The terms of the Amoco easement are especially damaging to the development of the land, as that easement permits Amoco to lay additional pipelines anywhere on the property. (Comm. Rpt at 251-52). We find that the commission fully considered all aspects of the pre-existing pipelines, including their location and the terms of the easement, and correctly concluded that the impressment of the Guardian easement would not affect the land to the extent that defendant claimed. We agree with the commission's just compensation determination regarding this tract.

---

[23]This line runs, for the most part, parallel with the Guardian easement, before the Guardian easement turns more north, creating a triangle piece of land which defendant argues cannot be developed.

## Objection to the Applicable Interest Rate

Guardian argues that the interest rate applied by the commission was erroneous. The commission applied the rates found in Moody's Composite Index of Yields on Long Term Corporate Bonds. Guardian argues that this was an incorrect rate. It argues that because federal law applies, the correct indicator is the Declaration of Taking Act. 40 U.S.C. § 3114 *et seq*. But as the commission noted, the rate formula in the Act is considered a floor, not a ceiling, to what interest should be awarded in a condemnation proceeding. United States v. 50.50 Acres of Land, 931 F.2d 1349, 1355 (9th Cir. 1991). Where a party can demonstrate that the rate formula would be constitutionally inadequate, interest should be awarded at a rate that a reasonably prudent person would receive by investing funds so as to produce a reasonable return while maintaining safety of the principle. *Id.* We agree with the commission that, based on this case, as well as the reasoning in Miller v. United States, 620 F.2d 812 (Ct. Cl. 1980), that the prudent investor rule applies in this instance. We further agree that the rates determined by the Declaration of Taking Act do not satisfy this rule.[24]

The commission then considered several publications tendered by the parties, including the Federal Reserve Statistical Release, tendered by Guardian. This release lists a variety of interest rates for different types of instruments of which the commission and this court could take judicial notice. The commission found, based on Miller, that Moody's Composite Index of Yields on Long Term Corporate Bonds, "Aaa" was the appropriate indicator of reasonably prudent investment. We agree. As the court stated in Pitcairn v. United States, 212 Ct. Cl. 168,

---

[24]The commission noted in its report that the rates for one-year Treasury constant maturities , as calculated under the Taking Act formula, are 2.70% for the first year through April 4, 2003; 1.27% through April 4, 2004; 1.23% through April 4, 2005; 3.38% through April 4, 2006; and 4.82% after April 4, 2006. (Comm. Rpt. at 17-18).

196 (Ct. Cl. 1976), "long-term corporate bond yields are an indicator of broad trends and relative levels of investment yields or interest rates. They cover the broadest segment of the interest rate spectrum. The corporate bond market is large, substantially in excess of long-term Government bonds and long-term corporate yields measure basic trends and relative levels of interest rates from one period to another." Thus, we find that the interest rates determined by the commission were proper.[25]

<u>Objection to Date on Which Interest Should Begin to Accrue</u>

Defendant Wormley contends that the commission erred in determining that the date interest should begin to accrue is the date that this court entered an order giving Guardian possession of the land, April 4, 2002. Defendant argues that interest must begin to accrue when the taking impacts the owner's ability to use, enjoy, or convey the property at its pre-condemnation value. He finds that date to be June 21, 2001, the date that the first condemnation complaint was filed. Defendant cites no proposition for this argument, and we find none. The Supreme Court in <u>Kirby Forest Industries, Inc. v. Untied States</u>, 467 U.S. 1, 10 (1984), held that the interest began accruing on the date of the taking. The Court found that the initial filing of a condemnation complaint was insufficient to constitute a taking if the owner was still free at that time to make whatever use he or she pleased of his or her property. <u>Id.</u> at 15. Here, there were no restrictions on defendant's use of his land prior to the order entered by this court granting possession to Guardian. Defendant was free to use his property as he pleased, and even to sell it. Defendant argues that the date should run from the time of the

---

[25]We also overrule defendant Wormley's objection that the applicable interest rate of a prudent investor should be in excess of the rate an investor is willing to pay for financing. Defendant has cited no caselaw to support his position, nor has he cited anything that supports his allegation that financing rates during the applicable period were between five and six percent.

filing of the condemnation complaint because after that date defendant would only be able to sell his land at a reduced price. But the Supreme Court has made clear that "impairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking." <u>Kirby Forest</u>, 467 at 14. Thus, defendant could not be compensated for that period of time. We agree with the commission that the proper date of the taking for the purpose of accrual of interest is April 4, 2002.

<u>CONCLUSION</u>

For the foregoing reasons. we overrule plaintiff's and defendants' objections to the report of the commission, and adopt that report in its entirety as a proper determination of just compensation in this proceeding.

JAMES B. MORAN
Senior Judge, U. S. District Court

May 2, 2007.